DONALDSON ET VIR. *v.* MERCANTILE-SAFE DEPOSIT AND TRUST COMPANY, TRUSTEE

[No. 20, September Term, 1957.]

*Decided October 29, 1957.*

The cause was argued before COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Roger B. Williams* and *Roger A. Clapp* for the appellants.

*Stuart S. Janney, Jr.,* and *Arthur W. Machen, Jr.,* with whom were *Venable, Baetjer & Howard* on the brief, for the appellee.

COLLINS, J., delivered the opinion of the Court.

This case involves the question as to the proper allocation of stock between a life tenant and remaindermen.

The facts of the case are for the most part not disputed. Mr. Elias A. Blackshere died on October 20, 1908, leaving a last will and testament, dated October 7, 1904. By Item 1 he devised and bequeathed a life estate in all his property unto his wife, Harriet B. Blackshere. By Item 4 he devised and bequeathed all of his estate after the death of his wife, Harriet, unto the Safe Deposit & Trust Company, in trust to pay over the net annual income, revenue or proceeds therefrom to his daughter, Katharine B. Donaldson, (Mrs. Donaldson), one of the appellants here, and further directed that an equity court supervise the administration of the trust. Mr. Albert E. Donaldson, the other appellant, is the husband of Mrs. Donaldson. By Item 5 of his will Mr. Blackshere authorized Mrs. Donaldson, after the death of Mrs. Blackshere, to dispose of the whole of the trust estate by her last

will and testament. If she did not do so he directed that the same pass to and devolve upon such person or persons as would under Maryland law be his heirs at law as to real estate, and his next of kin as to personal estate.

Mrs. Blackshere died on June 9, 1920. On October 15, 1920, the Circuit Court No. 2 of Baltimore City assumed jurisdiction of the trust under Mr. Blackshere's will. As a result of a petition filed on October 21, 1941, a decree was entered by that court on November 4, 1941, authorizing the trustee to invest in its discretion in common and preferred stocks, or either, provided that such investments be ratified by the court as directed in the will. On October 2, 1956, Mrs. Donaldson filed a petition setting forth substantially the following facts and asking that she be awarded as income at least 464 shares of the stock of The Texas Company, (Texas), and at least 229 shares of the stock of the American Gas and Electric Company, (American Gas).

As to the Texas stock, on February 28, 1945, the trustee purchased 200 shares of common stock, each share of the par value of $25.00, the purchase price being $10,889.59. On October 2, 1947, the trustee subscribed to 40 additional shares of common stock, each share of the par value of $25.00, the purchase price being $1,800.00. On June 15, 1951, the trustee received 240 additional shares of common stock, each share of the par value of $25.00, described by Texas as a "stock split". On October 26, 1955, the trustee sold 80 shares for $8,613.46, thereby reducing its holdings to 400 shares. On June 18, 1956, the trustee received 400 additional shares of common stock, each share of the par value of $25.00, again described by Texas as a stock split. The trustee then held 800 shares.

As to the American Gas stock, the trustee on February 8, 1951, purchased 100 shares of common stock, each share of the par value of $10.00, for $5,439.96. On April 16, 1951, it subscribed to 6 shares of common stock, each of the par value of $10.00, for $313.50. On May 10, 1951, it purchased 94 shares of common stock, each of the par value of $10.00, for $5,045.80. On June 25, 1951, it purchased 100 shares of common stock, each of the par value of $10.00, for $5,506.51.

At that time it held a total of 300 shares. On September 18, 1951, it received as a stock dividend 15 shares of common stock, each of the par value of $10.00, five shares of which were delivered to Mrs. Donaldson, life tenant, as income, making the total shares then held by the trustee 310. The trustee purchased on November 1, 1951, 35 shares of common stock, each of the par value of $10.00, for $2,039.06, making a total holding at that time of 345 shares. On January 10, 1953, the trustee received as a stock split 345 shares of common stock, each of the par value of $5.00, making the total holding at that time 690 shares. On July 23, 1953, the trustee purchased 43 shares and on August 6, 1953, 17 shares of common stock, each share of the par value of $5.00, for $1,283.39 and $516.59 respectively, making a total holding at that time of 750 shares. The trustee received on June 28, 1956, 375 additional shares of common stock, each share of the par value of $10.00, and described by American Gas as a stock split.

At the time of the first stock split of the capital stock of Texas on June 15, 1951, it had outstanding 13,797,624 shares of capital stock, each share of the par value of $25.00. The directors of Texas recommended to the stockholders in the Notice of the Annual Meeting to be held April 24, 1951, and in the proxy, that the authorized capital stock be increased from 20,000,000 shares to 40,000,000 shares, each of the par value of $25.00. It was further stated that the purpose was to effect a two-for-one split of the "Capital Stock of the Company by the issuance to its stockholders of one additional share of Capital Stock, par value $25, for each share of such stock held by them." It was also stated that the directors on January 26, 1951, adopted a resolution declaring such a stock split to be advisable and that "Such action would result in doubling the number of shares held by each stockholder, as well as the shares held in the treasury of the Company, without any change in the par value ($25) of each share. The number of issued shares would thus be increased from 13,797,624 to 27,595,248. The Capital Stock Account would be increased by an amount equal to the aggregate par value ($344,940,600) of the additional shares issued,

and this would be effected by a transfer to that account of $133,103,357 from Capital Surplus and $211,837,243 from Earned Surplus." It was further stated that the directors believed that such a stock split would be to the best interests of Texas, would increase the number of stockholders, and broaden the market for its capital stock. It was further stated: "It, therefore, believes that it is in the best interest of the Company to so increase the authorized Capital Stock and to effect a two-for-one stock split if conditions at the date of the annual meeting still warrant it." The resolution, recommended in this notice, was passed by the stockholders at the annual meeting on April 24, 1951, and as a result the trustee received 240 additional shares on June 15, 1951.

The pattern of the 1951 Texas stock split was followed by another so-called stock split in 1956. The directors on January 20, 1956, passed a resolution recommending to the stockholders that Texas effect another two-for-one split by issuing to its stockholders one additional share, of the par value of $25.00 for each share of such stock held, and that the authorized capital stock be increased to 75,000,000 shares. The resolutions adopted by the directors show that there was transferred to the capital stock account $2,411,250.00 from capital surplus and $688,219,950.00 from earned surplus. The resolutions further stated that "such a stock split would increase the number of stockholders of the Company and broaden the market for its Capital Stock and that this would be to the advantage of the Company." These resolutions were approved by the stockholders at the annual meeting on April 24, 1956.

The Notice of the Annual Meeting of American Gas, which was to be held on April 25, 1956, and the proxy statements, stated that the directors resolved to submit to the shareholders for consideration a plan changing the par value of the common stock from $5.00 to $10.00 per share, a 1½ for 1 split of the common stock and an increase of the authorized number of shares of common stock to 25,000,000. It was further stated that the directors considered the proposed revision advantageous because such action would make the shares more attractive to the investing public and finance its expansion

program. The notice further stated that on March 27, 1956, $65,550,540.00 was transferred from capital surplus to capital. Also, that in the event that the proposed revision became effective, the remaining "balance of $24,999,480 of capital surplus will be transferred to capital and $40,551,060 of earned surplus will also be transferred to capital, so that the aggregate capital of the Company will be $196,651,620." The recommended revision was passed by the stockholders on April 25, 1956, and pursuant to that action, the trustee received 375 additional shares of American Gas stock.

The appellants contend that the 240 additional shares of common stock of Texas, each of the par value of $25.00, described by Texas as a stock split and received by the trustee on June 15, 1951, and the 400 additional shares of common stock, each of the par value of $25.00, described by Texas as a stock split and received by the trustee on June 18, 1956, are apportionable between the life tenant, Mrs. Donaldson, and the remaindermen. They further claim that the 375 additional shares of American Gas common stock, each of the par value of $10.00, designated by American Gas as a stock split and received by the trustee on April 25, 1956, should also be apportioned between Mrs. Donaldson and the remaindermen.

After hearing, the chancellor decreed that the distribution to the trustee of the stocks of both Companies should be treated as principal of the trust estate, that it should not be apportioned between the life tenant and the remaindermen, and dismissed the petition of the appellants. From that decree they appeal here.

The Legislature of Maryland, by Chapter 580, Acts of 1939, abrogated the "Pennsylvania Rule" with respect to the apportionment of stock dividends which had theretofore been followed in this State. This statute, Code, 1951, Article 75B, Section 5, provides in part: "(1) All dividends on shares of a corporation forming a part of the principal which are payable in the shares of the corporation shall be deemed principal." This statute, which was enacted shortly after the decision of this Court in 1938 in *Heyn v. Fidelity Trust Co.*, 174 Md. 639, 197 A. 292, 1 A. 2d 83, 739, governs all trusts created after June 1, 1939, unless the trust instrument other-

wise provides. The present trust, having been created in 1908, is not governed by the 1939 statute. *Lindau v. Community Fund of Baltimore,* 188 Md. 474, 478, 53 A. 2d 409. The appellee contends that the declaration of the Companies that the distributions were stock splits is binding upon all parties. The so-called Pennsylvania Rule was first adopted by this Court in the case of *Thomas v. Gregg,* 78 Md. 545, 28 A. 565, in an opinion by Judge Boyd, where he held, after a review of many cases, including those in Pennsylvania, that in the distribution of stock, so much of the surplus earnings, as accumulated before the death of the testator, was principal and subject to the trust and that the accumulations after the death of the testator were as much a part of the income of the principal as the current dividends, and as such belonged to the legatees of the income for life. It was also there said:

"When it is possible for the Court to ascertain to any certainty whether the distribution in the stock dividend includes net earnings, and, if so, what proportion, and also whether such earnings were intended to be made a part of the capital or merely to be used temporarily with the intention on the part of the directors of refunding them to the shareholders as income, we think it is the duty of the Court to make such investigations and dispose of the stock in an equitable way between the tenants for life and the remainder-men."

This Rule has been followed by this Court in a number of cases, among which was *Ex parte Humbird,* 114 Md. 627, 634, 80 A. 209, where Judge Urner, relying on the cases of *Thomas v. Gregg, supra, Quinn v. Safe Deposit Co.,* 93 Md. 285, 48 A. 835, and *The Atlantic Coast Line Dividend Cases,* 102 Md. 73, 61 A. 295, and others, said, in discussing the Pennsylvania Rule:

*"In considering this question, we are not to be governed by the mere form in which the dividend has been declared.* The origin and character of the fund out of which the dividend is paid is the control-

ling subject of inquiry. If it is found to represent earnings, it will be held to be income; but if it is an appropriation of capital, it belongs to the corpus." (Italics supplied).

In *Lindau v. Community Fund of Baltimore, supra,* decided in 1947, Chief Judge Marbury reviewed the Maryland cases and many others and stated that the Pennsylvania Rule had been adopted by this Court without qualifications. The limitation of that Rule was there stated as follows:

"'The Pennsylvania rule is that an extraordinary or stock dividend is presumptively payable to the party entitled to the income when the dividend is declared, that is, the life tenant. This is, however, a rebuttable presumption and upon proof that the payment of the whole dividend to the life tenant will impair the book value of the corpus, an allowance must be made out of the dividend to the corpus to compensate it and keep it intact."

See the many cases cited.

The appellee admits that "there were transfers from earned surplus and capital surplus to capital stock accounts of amounts equal to the par value of the new shares." As above set out, the resolution of Texas states that in the 1951 stock split $133,103,357.00 from capital surplus and $211,837,243.00 from earned surplus were transferred to the capital stock account. The resolution of Texas in 1956 shows that $2,411,250.00 from capital surplus and $688,219,950.00 from earned surplus were transferred to the capital stock account. The resolution of American Gas, as above stated, also shows that in the 1956 so-called stock split a large amount was transferred from capital surplus and earned surplus to the capital stock account. In *Soles v. Granger* (U. S. Court of Appeals, 3rd Cir.), 174 F. 2d 407, decided in 1949, it was held that an income beneficiary of a testamentary trust owning stock was entitled under the Pennsylvania Rule of apportionment to a proportionate share of a stock split representing capitalization of surplus earned after the trust came into existence.

The appellee contends that, although the Pennsylvania Rule was in effect in Maryland up until 1939, there has been a period of inflation in the last twenty years, marked by a continuing decline in the purchasing power of the dollar, and it would therefore be inequitable to make the distribution contended for by the appellants because it would impair the real value of the corpus of the trust. However, even with the distribution to be ordered here, the combined market value of the Texas and American Gas stocks at the time of the hearing, was more than twice as much as the book cost. It also appears that the value of the corpus of the Blackshere trust has almost doubled since October 21, 1941, when the petition was filed to invest in stocks.

Appellee relies strongly on the case of *In re Lindsay's Will,* 109 N. Y. S. 2d 600, decided in 1952, to sustain its contention that the distribution sought by the appellants goes beyond the Pennsylvania Rule. It was there stated by the Surrogate that, although he had no right to disregard established precedents of New York's highest court, changing times and events indicate a change in public policy and that, since Pennsylvania had itself changed its rule by statute, as had New York, the rule did not apply to an old trust created before the passage of that statute. However, this statement was pure *dictum* as the case had already been decided on another point. In the later case of *In re Davis' Estate,* 128 N. Y. S. 2d 152, decided in 1953, the Surrogate there pointed out that in a stock dividend there is a capitalization of earnings or profits and a distribution of the shares which represent assets transferred to capital, while in a stock split there is a mere increase in the number of shares without altering the amount of capital or surplus. It was there stated that, even though the board of directors spoke of the transaction as a stock split, the corporate records showed clearly that their purpose was to capitalize earnings and to issue additional shares of stock which, in part, represented the earnings thus permanently retained, and that the same stock split of Texas in 1951, which is before us here, should be apportioned between principal and income.

The appellee relies strongly on the Rule of the New York

Stock Exchange which requires a corporation to transfer from earned surplus to the permanent capitalization of the corporation an amount equal to the fair value of the shares where there is a stock dividend. Here, Texas and American Gas were not required to capitalize a greater amount than the par value of the new shares. Appellee therefore contends that as these corporations were not required to transfer the fair value of the shares, this is further indication that this was a stock split and not a stock dividend. Appellee also relies on Accounting Research Bulletin No. 11, issued by the Committee on Accounting Procedure of the American Institute of Accountants. This bulletin states that a stock split-up "refers to an issuance by a corporation of its own common shares to its common shareholders without consideration and under conditions indicating that such action is prompted mainly by a desire to increase the number of outstanding shares for the purpose of effecting a reduction in their unit market price and, thereby, of obtaining wider distribution and improved marketability of the shares." Appellee contends that, because in the aforesaid resolutions of Texas and American Gas it was stated that the distribution of the stock was made in order to render the shares more attractive to the investing public and to broaden the market for the stock, this was further indication that the distributions here were stock splits and not stock dividends. However, in answer to this argument, as above set out, it is admitted that there were transfers from earned surplus and capital surplus to capital stock accounts. These transfers included earnings of the corporations during the life tenancy of Mrs. Donaldson and as such life tenant she was entitled to those earnings.

We conclude that the shares of stock in question here issued by Texas and American Gas and received by the trustee are apportionable between Mrs. Donaldson, the life tenant, and the corpus of the estate.

The next question to be decided is the rule of apportionment to be followed. Mr. George Pausch, the senior vice-president of the trustee, submitted at the hearing a carefully prepared computation showing the amounts which he claimed would be allocated as to the stock of Texas and American

Gas, if the apportionment were made between income and corpus. All parties to this case agree that, if the apportionment be made, Mrs. Donaldson is to receive 466 shares of Texas stock. The question is therefore confined to the distribution of American Gas stock, the trustee contending that in such distribution, if made, the life tenant would be entitled to only 50.63 shares.

The calculations required and applied to apportionment are very involved and intricate. Appellants argue that the life tenant is entitled to 161.31 shares for the reason that the amounts in excess of the par value of shares issued as stock dividends, which amounts were transferred from earned surplus to capital surplus, pursuant to resolutions of the directors at the time when such stock dividends were issued in 1951, 1953, and 1956, are still to be regarded as undistributed earnings. These sums had been eliminated from earned surplus by action of the directors and were so shown on the Company's books of account. The books did not include these amounts in earned surplus at the time of the 1956 stock split here in question. Here, it is admitted that transfers of certain amounts were made. We are asked by the appellants to require the trustee to revise the books and accounts of American Gas, and to increase the undistributed earnings included in earned surplus in 1956, by adding back amounts previously transferred from earned surplus and capitalized in connection with the stock dividends previously declared. We see no error in the computations by the trustee. The life tenant in the distribution of those stock dividends has received her proportion of the earned surplus she now seeks to have used again as a basis for another distribution.

We have decided that the life tenant is entitled to the earnings from the corpus during her life tenancy. Without setting out in detail the complicated calculations and the various tests suggested, it appears that, if the new shares distributed on account of each block of American Gas stock are apportioned between income and corpus in the ratio the earnings bear to the total amount transferred from surplus to capital account, the life tenant would receive an aggregate of 50.63 shares out of the total of 375 new shares issued. This is the maximum

number distributable to the life tenant under the earnings test. We are therefore of opinion that Mrs. Donaldson should be awarded 466 shares of The Texas Company stock and 50.63 shares of American Gas and Electric Company stock.

*Decree reversed, and case remanded for the passage of a decree in conformity with this opinion. Costs to be paid out of the corpus of the trust.*